DeArusmant *v.* DeLagerty.

F. SYLVA DEARUSMANT *v.* CLEMENCE DELAGERTY, CHARLES PATTON, *et al.*

TRUSTEE AND CESTUI QUE TRUST. *Trust property.* A conveyed a tract of land to L by deed, acknowledged and registered, no lien retained. A by contract was to receive an annuity from L, and at his death to be paid a sum of money, which was to be a prior lien upon all his property. This contract was unregistered. L under a contract put P, his agent, in possession of the land. L left the country and P filed a bill against him as a non-resident for account, and the land was sold. S became the purchaser, and afterwards conveyed to P, who all the time was in possession. L died abroad, and his heirs commenced suit against P for the land, which was compromised by giving the heirs a part of the land. A files bill to enforce her contract. *Held,* she was entitled to have the land sold to pay her the amount due, both the land held by P and by the heirs. The agent could not, without notice, change the character of his possession so as to make it adverse. The heirs take the real estate subject to all burdens imposed upon the property.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. R. J. MORGAN, Ch.

W. M. RANDOLPH for complainant.

T. W. BROWN, H. M. HILL and GEO. GILLHAM for defendants.

FREEMAN, J., delivered the opinion of the court.

This case has been argued with much zeal and ability by counsel, and we proceed to give the result

of our investigation of the facts as presented by the record. The original bill of complainant was filed on the 28th of March, 1874. Several amended bills were subsequently filed, which make up the ground of the relief sought. A short statement of facts will serve to present the questions for decision, on which the result must turn.

On the 9th of October, 1860, Eugene DeLagerty, in the State of Kentucky, entered into the following contract with complainant: "Know all men by these presents, that Eugene DeLagerty, of the State of Kentucky, in the United States of America, does hereby acknowledge himself indebted to Frances Sylva Phigrupal DeArusmant in the sum of fifty thousand dollars, for property sold to him by the said Frances Sylva P. DeArusmant; and the said Eugene DeLagerty hereby binds himself and his heirs, administrators and assigns, to pay the said Frances Sylva De Arusmant, or her assigns, the sum of five thousand dollars during each and every year of her natural life, said sum to be paid on the first day of November in each year; and it is distinctly understood and agreed by and between the said parties, that in case the said Eugene DeLagerty should die before the said Frances Sylva DeArusmant, then she and her heirs and assigns shall have a lien preferable and prior to all others, upon the estate, real, personal and mixed, of the said Eugene DeLagerty, for the payment of said sum of fifty thousand dollars, as well as for the payment of any portion of the said annuity which may then remain due and unpaid." This instrument was not

registered at the time, nor until after the commencement of this suit, probably in 1878, not long before the final decree.

The complainant was, at this time, owner of a large tract of land in Shelby county, Tennessee, on the Memphis and Charleston Railroad, about twelve or fourteen miles from the city of Memphis. This land, probably fourteen hundred acres, was uncleared, with a large amount of valuable timber on it. On the 31st of January after this, 1861, complainant executed to DeLagerty a deed conveying this body of land to him, which deed was registered in Shelby county soon after its execution. This deed on its face expresses the consideration for it to have been thirty thousand dollars, to be paid by DeLagerty, the receipt whereof was acknowledged in the face of it. No lien was retained for the purchase money in said deed.

It is shown, however, pretty clearly, and is not seriously questioned in argument, that the price of this land made up a part of the consideration for the contract of date of October 9th, 1860—the other twenty thousand dollars being probably the consideration for certain mortgages on property in the city of Cincinnati, which were also transferred (or are said to have been) by complainant to said DeLagerty. Complainant at this time is shown to have resided in the family of DeLagerty, and had done so since 1858. He was a relative of Frances, was married and had several children—his mother being a woman of some wealth, and residing in the city of Paris, France. These transactions took place in the city of Covington,

Kentucky, where the parties then resided. About this time DeLagerty seems to have conceived the design of sending his wife to Paris, with probably one of the children, and it is to be more than suspected, his purpose was to form a connection with complainant, to which, we take it, she was not averse. We need not go into the evidence in support of this suggestion, as it does not materially bear upon the solution of the legal questions on which the rights of the parties in this case depend. Suffice it to say, that his wife was sent to Paris, from which place she never returned to America, nor do we think it was desired or expected by either complainant or DeLagerty that she should ever do so, when she left.

Not long after the contract of October 9th, 1860, DeLagerty entered into the following contract with defendant, Charles Patton. " Doctor DeLagerty having a certain quantity of land in the vicinity of Memphis, Tennessee, commonly called the Neshoba tract, and being anxious to have the same cleared and put into suitable condition for farm or other purposes, has this day entered into the following contract with Charles Patton, to-wit: The said Charles Patton agrees to devote his undivided time and energies in carrying out the above intention according to instructions furnished him by said Dr. DeLagerty, and in consideration of the perfect performance of said work he is to receive in compensation twenty per cent. on the products sold off said land, viz., firewood, lumber and other farm products, after deducting expenses. All sales made on a credit will be at the risk of said Dr. DeLagerty.

DeArusmant v. DeLagerty.

The above allowance of twenty per cent. is in consideration of Charles Patton remaining in the above employment until the whole work is performed, and in case he should desire to leave said employment at an earlier day and previous to the work being performed, then the above per centage will be reduced to ten per cent. The work will be considered done when the lots Nos. 1, 2, 5, 6, 7 on said tract, surveyed by W. E. Rucker, of Memphis, are sufficiently cleared for residences, and the bottom land lots, 1, 2, 3, 14 and 15, north of Wolf river, are cleared and disposed of, and the products sold.

Dr. DeLagerty will also furnish Charles Patton a house and garden lot for himself and family on the premises; furthermore, Charles Patton is to receive on account of his services, fifty dollars monthly, and at the expiration of each year the compliment of ten per cent. of the sales which have been made, the balance to be placed to his credit until a final settlement. This contract to commence on the 15th day of November, 1860."

In pursuance of this contract, Patton came down to Shelby county from Cincinnati—his family following soon after, and commenced operations—both parties evidently having most extravagant views as to the result of the contemplated establishment—the Frenchman, Dr. DeLagerty, going no doubt far beyond the cooler American, in these anticipations. Miss DeArusmant came down with these p rties; but the excitement incident to the opening scenes of the war, no doubt suggested to these parties that a return to the north was

more in accord with their plans, and so they returned to Cincinnati, and from thence went to Philadelphia, and not long after were married in New Jersey—Miss DeArusmant insisting (and, we take it, she thinks truly) that she believed the wife had died after her return to Paris—Dr. DeLagerty having so informed her. That he believed this, we do not believe—except on the principle that we readily persuade ourselves of the truth of that which we desire to be true.

We may say here in passing, that it does not appear that Patton knew anything of the contract for the fifty thousand dollars, the annuity, or in fact anything definite of the plans of these people, whose notions of propriety were evidently outside the range of his experience. Complainant swears in her deposition he did know all their plans; but this is denied by Patton in his answer as well as in his deposition, and must be decided as not proven.

Complainant and DeLagerty remained in Philadelphia, or the neighborhood, in most straitened circumstances until probably 1867, when they went to Scotland, where she had an estate yielding, it seems, about two thousand dollars per annum. On this they lived for some time, when the property was sold, and they started to the continent, where at Sianna, in Italy, he died, 23d of December, 1873.

Before leaving Scotland, complainant concedes she was informed that the wife was not dead, as she professes to have believed, but this seems not in the least to have tended to relax her hold on the ill gotten husband.

13—VOL. 9.

During all this time, Patton remained on the lands, holding for DeLagerty, carrying out, as far as we can see, the terms of his contract in good faith, as far as it could be done in view of the disturbed condition of the country. DeLagerty was expected to return in the spring, perhaps, when he left, but, as we have said, did not do so.

In this situation of things, after making inquiry by writing to parties intimate with DeLagerty as to his whereabouts, with no result, on the 15th of May, 1865, he filed his bill in the common law and chancery court at Memphis, stating the contract between them, the purchase of the land from complainant by DeLagerty, and adds, that he was not informed as to what consideration was paid Miss DeArusmant, but suggested that his best information and belief is, that she still retains in equity and in right an interest, though an exceedingly small and remote one, in said land, and should justly be regarded and treated as to some slight extent part owner thereof. She was, in view of this assumed interest, made at first party to this bill, but afterwards it was dismissed as to her, for reasons stated in the order. These statements of the bill are explained in the answer fully as follows: That the records of Shelby county had been removed from the State, and it was assumed that she might have retained some interest or right as to the land in the deed from her to DeLagerty. When access was had to these records, it was seen that she had no such interest therein appearing; and thereupon Patton

dismissed his bill as to her, stating the above reasons substantially in the decree of dismissal.

This bill was based first on the theory that Patton had taken charge of the property as agent, under the written contract; that the contract had been kept by him, and that his services had been given, by which he had entitled himself to the compensation stipulated for, and proposes an account of the transtions between the parties.

In addition, there was a large claim made, based on the theory that DeLagerty had agreed to erect a saw-mill on the place, for sawing the timber into lumber for sale—was to furnish a hotel or station house at the railroad, and they were also to carry on a large brick-yard, together with perhaps other undertakings—from which it was contended by Patton, that he should receive at least $5,000 per annum, and that he had been induced, in view of the performance of these verbal agreements, to break up his home in Cincinnati, and settle on the land; but that DeLagerty had failed to do any of the things agreed, and had left the United States, with no effort on his part to perform his contract, and so he claimed he was entitled to recover on this score. He filed with his bill his account as agent itemized, showing what he claimed was the state of the account between them; and then an item for the profits promised by the assumed verbal contract, to-wit, profits on brick-yard, saw-mill, and sales of all kinds of produce from the Neshoba farm, which amounts to $25.000. He credits DeLagerty with moneys received from a note sent him to collect,

with proceeds of cord-wood, cotton and other things, to the amount of $4,203.58; and for balance claimed to be due, he seeks a decree against DeLagerty, and has an attachment against the Neshoba lands, on the ground that he was a non-resident.

We need not go through the history of this case, further than to say, it proceeded to a decree by regular stages, after a publication as to DeLagerty, and the land was ordered to be sold, and was sold by the clerk and master on the 15th of October, 1866, when Nelson Speers became the purchaser, by his agent, a son, who it seems resided on the place, at the sum of $21,335, giving his notes due at six and twelve months, for the price. On the 8th of December, 1866, this report of the clerk and master was acted on, and the sale confirmed, the title divested out of DeLagerty and vested in the purchaser, and he ordered to be put in possession of the same, a lien being retained for payment of the purchase money.

The matter thus stood, until February, 1867, when the clerk reported that the costs had been paid, $351. He further reported, that Charles Patton, for whose benefit the sale was made, had offered to take the notes of Speers, the purchaser of the land, for their full amount, and receipt for the same as so much paid on his decree, which was recommended to be accepted. Which report was confirmed and approved by the court in March, and a final decree entered, satisfying Patton's debt, and again formally vesting the title in Speers, the purchaser, and a judgment was rendered over against DeLagerty for the balance of his debt ascer-

tained in the original decree. In this decree, however, a lien is expressly retained in favor of Patton, for payment of the notes by him received.

Under this decree Speers claimed title to the land, Patton claiming to occupy it under him and hold for him, till the spring of 1874 (March 8th, 1874) when Speers conveyed it to Patton by a quit claim deed, from which time he held for himself, as he says. The bill in this case was filed soon after this convey-ance, March 28th, 1874.

This bill goes on the theory, first, that complainant is for some cause entitled to have the deed made by her to DeLagerty cancelled, and the sale to Speers declared void, and the conveyance to Patton also de-clared void, and title revested in her. We need but say, there is no ground on which she can claim title to the land.

The alternative relief, however, is sought that she shall be entitled to charge upon the land, by virtue of the contract of October 9th, 1860, as the consideration of the conveyance of January, 1861, the fifty thousand dollars. We need but say, that only thirty thousand dollars is pretended to have been the consideration of that conveyance; no lien is retained on the land, the contract was not registered, and no notice of the lien or preference therein brought home to Patton, and if he is not affected by other equities, then no lien can be enforced as a vendor's lien against the land in his hands.

The next alternative relief sought by the bill is on the theory that she is a creditor of DeLagerty, by

virtue of the contract of October 9th, 1860, and is. entitled to charge the land with the sum therein specified, and have a preference by its terms on all his. estate.

The main question, we take it, in this case is, whether as such creditor, she is entitled to charge the lands, and appropriate them, either in the hands of the heirs, to whom five hundred acres were decreed in a compromise decree, or in the hands of Patton, as holding under Speers, and he under the decree made for sale of the land in the case of *Patton* v. *DeLagerty,* which we have referred to.

Several grounds are presented and urged with much ability in favor of this relief, as against the entire lands, some of which we notice.

The bill and amended bill simply attack the sale of Patton, obtained under the decree, on the ground that it was void for want of proper publication, as required by law in order to bring DeLagerty before the court; and then because, on the facts charged, of the relationship between Patton and DeLagerty, the claim presented in his bill, and the whole proceeding, was fraudulent as to DeLagerty, and so Patton holds. the property subject to the rights of the creditor of DeLagerty, as having fraudulently, through the agency of a suit in chancery, obtained the legal title to. himself.

In addition it is charged that when DeLagerty left the land in January or February, 1861, to go to Kentucky, Patton was left in possession of the land and in charge of it, to take care of it, occupy and pro-

tect the rights and interests of DeLagerty and also of complainant, during their absence. So far as any undertaking for complainant is concerned, we need but say here, the proof fails to make out the case.

We need not discuss all the various questions argued by counsel.

Whether Patton's decree was valid or invalid, the statute of limitations would be a bar to any assertion of the right of complainant as a creditor of DeLagerty, as it would be to DeLagerty had he sued himself—provided he is not precluded from insisting on the lapse of time by other considerations. But the real question is, could Patton, under the facts in this case, set up title under the statute, or was he, by reason of the relations between him and DeLagerty, as tenant, or agent in possession of the lands, precluded from purchasing or asserting a title to the same in the way it was done?

We have had some difficulty in reaching a conclusion on this question. The principle is one of unquestioned soundness, as held by this court in the case of *Armstrong* v. *Campbell*, 3 Yer., 201, that a trustee or party having control or charge of property charged with a trust for another, such an agent, or attorney in fact, cannot by any act of his own, without communication with the *cestui que trust*, so change the character of his possession as to make it adverse; and even if he sell the property or part with it in any way to one in whose favor time would run, and afterwards regain the property by purchase or descent,

he shall hold it incumbered with the trust.    See also, *McDonald* v. *McDonald*, 8 Yer., 149; 10 Yer., 104.

The case in 3 Yerger was this: Campbell, as at-torney at law and in fact, agreed to attend to the business of Armstrong with reference to certain lands granted to him and Dougherty in Tennessee.    Camp-bell undertook to ascertain the locality of the lands, and sell Armstrong's half to the best advantage, and was to receive one-third of Armstrong's one-half of the lands, as compensation, or one-third of the money for which he might sell them.    Campbell sold part of the lands to Trimble, for his own profit in fact, and re-ceived a reconveyance from Trimble.    This court held that the original trust being by contract, that when Campbell obtained title to the lands again the trust continued fastened upon them in his hands, and Arm-strong was entitled to have them.    The principle is, that the parties still occupied precisely the same rela-tion to each other as before the sale and purchase—the one as principal, the other as agent—there having been no notice of any adverse or antagonistic holding on the part of the trustee.

The question is, was Patton in possession of the lands by contract as agent, holding the same for DeLagerty, having charge and control of them, and bound to protect the title?

As to the written contract, it may well be doubted whether it furnishes clear evidence of such relation; but Patton, in his deposition, swears definitely, that when DeLagerty left the place in January or Febru-ary, 1861, to go to Kentucky, that he left him in

charge of the land, and that he held up to the entire boundaries of the land, it having been lately surveyed and a map made of the same, which was in his possession. He further swears he was holding it for DeLagerty, and he so continued to hold until the sale under the chancery decree, when he began to hold for Speers, the purchaser, and then in 1867, when reconveyed to him by Speers, he held for himself under that conveyance. This is the clear and definite result of the proof as made by himself.

We have the case, then, of a party left in charge of and in possession of land by the owner, who procures the same to be sold, on a claim which we can see was in the larger part groundless of legal right, and then regains the title in payment of his assumed debt. Unquestionably he must be held on this aspect, as in possession as of the old contract, and holding charged with the same trusts in favor of the party for whom he held before the sale and purchase by him. We think this is all clear, and needs no further argument to support it.

But a question of no little difficulty is now presented, arising out of the following state of facts:

In 1871, long after Patton had purchased and was in possession of the land, the heirs of DeLagerty commenced and prosecuted a suit in the chancery court, to recover this land, alleging the invalidity of the whole proceeding, and seeking to have it annulled. This suit proceeded regularly until there was a compromise decree made, in all things formal and regular, by which the court decreed five hundred acres of the

land to the heirs of DeLagerty, and the balance to Patton. What shall be the effect of this on complainant's rights as a creditor of DeLagerty, with a general lien on all his property, real and personal, as between him and her, after his death—not one fixed before and at the time of the contract—but one contracted to arise on his death? This is the sole claim of complainant, and she can stand on nothing else.

It is to be remarked in discussing this question, that complainant's lien, as per her contract, is not a specific lien on any particular property, but is only " a lien preferable and prior to all others, upon all the estate, real, personal and mixed, of the said DeLagerty," at his death—he dying before complainant.

Is she not, by the terms of the contract, confined to the property rights he may have actually had, and can she assert any above him, as against any party who had an adverse claim over him, and stronger than his?

It may be assumed that she was confined in the assertion of her lien, to the property which he actually owned at his death. But then she was no party to the proceedings between DeLagerty's heirs and Patton, and her rights attached on the death of DeLagerty and overrode the rights of the heirs by descent, being by contract with their ancestor, so that they took subordinate to her right. This being so, her right was independent of and separate from the title of the heirs, and stands unaffected by the compromise decree.

DeArusmant v. DeLagerty.

It follows, that the complainant is entitled to enforce her lien as against the land in his hands, and it will be so decreed.

The only other question is, as to whether this claim is superior to the claim of the heirs of DeLagerty? Without discussing the question, we hold that it is. They take the shoes of their ancestor, take subject to all legal burdens imposed on the property by him, and therefore cannot resist the lien of complainant, time not having created the bar of any statute of limitations in their favor.

A decree will be drawn in accord with this opinion, enforcing the lien of complainant by sale of the land in controversy. The clerk of this court will make the sale, selling in such parcels as may be deemed best, under the direction of complainant's counsel, or as at present laid off. No account or other matter growing out of occupation of the land by Patton, or other equity, is before us on this record, therefore nothing decreed in these matters.

Costs paid out of the fund.